SHEPHERD, FINKELMAN, MILLER
      & SHAH, LLP
James C. Shah
Natalie Finkelman Bennett
475 White Horse Pike
Collingswood, NJ  08107
Telephone: 856/858-1770
Facsimile: 856/858-7012
Email:  jshah@sfmslaw.com
           nfinkelman@sfmslaw.com

**Counsel for Plaintiffs and the Class**

**(Additional Counsel to appear on the signature page)**

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEPHEN TREWIN and JOSEPH FARHATT, On Behalf of Themselves and All Others Similarly Situated, | ) No: **3:12-cv-01475-MAS-DEA** )<br>)<br>) |
| Plaintiffs, | )  **AMENDED CLASS ACTION**<br>)  **COMPLAINT** |
| vs. | )<br>) |
| CHURCH & DWIGHT, INC., | )<br>)  **DEMAND FOR JURY TRIAL** |
| Defendant. | )<br>) |

Plaintiffs, Stephen Trewin and Joseph Farhatt (collectively, "Plaintiffs"), allege, upon

personal knowledge as to themselves and their own acts, and upon information and belief (based

on the investigation of counsel) as to all other matters, as follows:

## NATURE OF ACTION

1.      This action seeks to remedy the unfair, deceptive, and unlawful business practices of Church & Dwight, Inc. ("Defendant" or "Church & Dwight") with respect to the marketing and sales of Arm & Hammer® Essentials™ Natural Deodorant ("Arm & Hammer® Essentials™" or the "Product").  Defendant manufactures, markets, sells, and distributes Arm & Hammer® Essentials™ using a marketing, advertising and labeling campaign that is centered on representations that are intended to, and do, convey to consumers that Arm & Hammer® Essentials™ is an "all natural" product that contains "natural" ingredients and provides "natural" protection ("Natural Claims").  However, Defendant's advertising and marketing campaign is false and misleading because Arm & Hammer® Essentials™ is not all natural and, instead, contains artificial and synthetic ingredients, including triclosan, a chlorophenol, which is currently being reviewed by the Food and Drug Administration ("FDA").

2.      Plaintiffs relied on Defendant's Natural Claims and misrepresentations that Arm & Hammer® Essentials® was "all natural" when they purchased it.  Plaintiffs and the Class paid a premium for the Product over comparable deodorants that did not purport to be all natural.

3.      By relying on the representations that Arm & Hammer® Essentials™ was natural, Plaintiffs and the Class have been damaged and suffered an ascertainable loss by purchasing the Product because they paid more per ounce than they would have for deodorants that do not claim to be natural.   Plaintiffs did not receive the benefit of the bargain, a natural deodorant, when they purchased Arm & Hammer® Essentials™.  Instead, they received a deodorant, contrary to Defendant's representations, that was not all natural and that contains synthetic, chemical and potentially harmful ingredients.

4.      Through the marketing and sale of the Product, Defendant has deliberately conveyed a singular message: the Product is natural, and contains natural ingredients.  Each

- 2 -

person who has purchased the Product has been exposed to Defendant's misleading advertising message and purchased the Product as a result of that message on the Product labels and/or as part of the advertising.

5.     Defendant knows that consumers are willing to pay a premium for natural, healthy products, and advertised its Product with the intention that consumers rely on the Natural Claims and representations made on the label.  Defendant's claims are deceptive and misleading, and have been designed solely to cause consumers to buy the Product.  Defendant knew, at the time it began selling the Product, that it contained artificial ingredients and was not natural as represented.

6.     Reasonable consumers, such as Plaintiffs, do not have the specialized knowledge necessary to identify the ingredients in the Product as being inconsistent with the Natural Claims. Plaintiffs read and relied on the representations that Defendant made on the Product, namely the Natural Claims.

7.     This nationwide class action seeks to provide redress to consumers who have been harmed by the false and misleading marketing practices Defendant has engaged in with respect to the Product.  Defendant's conduct has included the systematic and continuing practice of disseminating false and misleading information from New Jersey and throughout the United States via pervasive multi-media advertising and the Product labeling, all of which were and are intended to induce unsuspecting consumers, including Plaintiffs and the members of the Class, into purchasing the more expensive Arm & Hammer® Essentials™, which is not natural, although this very supposed benefit serves as the basis for consumers' decision to purchase the Product, rather than deodorants that do not purport to be all natural.

8.      Plaintiffs assert claims on behalf of themselves and the Classes (defined below) for violations of the New Jersey Consumer Fraud Act, N.J.S.A. §  56:8-1, *et seq*. ("CFA") and Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020 (West 2010).

9.      Though this action, Plaintiffs seek injunctive relief, actual damages, restitution and/or disgorgement of profits, statutory damages, attorneys' fees, costs, and all other relief available to the Class as a result of Defendant's unlawful conduct.

## PARTIES

10.      Plaintiff Trewin is, and at all times relevant to this action has been, a resident and citizen of Sewell, New Jersey.

11.      Plaintiff Farhatt is, and at all times relevant to this action has been, a resident and citizen of the city of St. Louis, Missouri.

12.      Church & Dwight is a New Jersey corporation and, at all times relevant to this action, has maintained its principal place of business in Princeton, New Jersey.  Church & Dwight, thus, is a citizen of New Jersey.  All critical decisions made with respect to the Product, including all decisions concerning the marketing and advertising of the Product, were made by Church & Dwight employees located in New Jersey.  Church & Dwight sold the Product through retail stores, the Internet, and also through television and other advertisements, all of which led consumers to purchase the Product.  Church & Dwight knew, or should have known, that the Natural Claims and other representations it made regarding the Product were false and misleading at the time that it began distributing the Product in the United States market.

## JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2) because the matter in controversy, upon information and belief, exceeds $5,000,000, exclusive of

- 4 -

interest and costs, and this is a class action in which certain of the Class members and Defendant are citizens of different states.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because Defendant is a resident of this judicial district, conducts business throughout this district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims took place within and emanated from this judicial district.

## FACTUAL BACKGROUND

**The Product**

15.     This class action is brought against Church & Dwight for the benefit and protection of all purchasers of Arm & Hammer® Essentials™.

16.     The market for natural products is a large and growing one.  In recent years, consumers have been willing to pay a premium for products they believe to be natural, healthy and/or organic.  In recent years, *Natural Foods Merchandiser* magazine's 2010 Market Overview reported healthy growth for the natural and organic products industry.  With more than $81 billion in total revenue in 2010, the industry grew 7 percent during 2009, showing that consumers are spending again and that the natural products industry is healthy.  *See* http://www.prnewswire.com/news-releases/natural-and-organic-products-industry-sales-hit-81-billion-122958763.html.

17.     Defendant has had deodorants on the market for years.  In order to sell more products, and attempt to capitalize on this market for natural products, Defendant introduced Arm & Hammer® Essentials™.

18.     Arm & Hammer® Essentials™ is manufactured by Defendant and purports to be natural.  Unbeknownst to Plaintiffs, however, the Product contains unnatural, synthetic and potentially harmful ingredients.

19.     Arm & Hammer® Essentials™ is known to customers only by the representations made about the Products by Defendant.  If, as is the case here, Defendant sold other deodorants, then customers would have no reason to buy the new Product, Arm & Hammer® Essentials™ , and pay a premium for it, unless and until they are exposed to the messages about its purported properties and benefits, by Defendant.  The Product's properties are not only described on the label, but also in the marketing materials disseminated by Defendant.  In other words, given the existence of deodorants that do not purport to be all natural, long sold by Defendant, consumers would purchase Arm & Hammer® Essentials™ if, and only if, Defendant's labeling and advertising campaign persuaded them that the Product had benefits that others do not -- here, that Arm & Hammer® Essentials™ is all natural.

20.     The labeling and marketing communicates a straightforward, material message – that is, that the Product is all natural.

21.     The core representations alleged to be false and misleading, that the Product is natural, are contained on the label itself for every purchaser to read.

22.     The Product boldly states on the label that it is "The Standard of Purity."  Further, the Arm & Hammer® Essentials™ website advertises the Product as follows:

## ARM & HAMMER Essentials® Solid Deodorant, Fresh



### Description

**Contains ARM & HAMMER® Baking Soda and natural plant extracts to absorb and fight odor. Essentials® Deodorant does not contain aluminum, parabens, colorants or animal-derived ingredients. This fragrance is sure to leave you feeling fresh and clean with its blend of sparkling citrus, fresh lavender and soft florals.**

23.     As is shown above, the principal display panel ("PDP") label on the Product prominently displays the word "Natural" without any qualification.  The dictionary definition of "natural" includes "existing in or formed by nature (opposed to artificial); not artificially dyed or colored."  http://dictionary.reference.com/browse/natural.  The numerous chemical ingredients, listed on the information panel on the back of the Product and described in detail below, are not natural or naturally derived and are not the type of ingredients a reasonable consumer would expect to be in a natural product.

24.     In addition, the PDP prominently states:  "Natural Protection, Aluminum Free, Paraban Free."  This statement implies to a reasonable consumer that Defendant's Product

contains only natural ingredients.  Given that Defendant's Product includes synthetic ingredients, the PDP is false and misleading.

**The Unnatural Ingredients**

25.     Contrary to Defendant's representations, Arm & Hammer® Essentials™ contains the following ingredients which are not natural:

>    ***a.  Dipropylene Glycol***.  Dipropylene glycol is produced as a byproduct of the manufacture of propylene glycol.  Propylene glycol is known as 1,2-propanedioli, and is a petroleum derivative that "does not appear in nature." 21 C.F.R. § 184.1566.  It is manufactured by treating propylene with chlorinated water to form chlorohydrins, which are converted to the glycerol by treatment with sodium carbonate solution, or by heating glycerol with sodium hydroxide.
>
>    ***b.  Propylene Glycol.***  Propylene glycol is known as 1,2-propanedioli, is a petroleum derivative that "does not appear in nature."  21 C.F.R. § 184.1566.  It is manufactured by treating propylene with chlorinated water to form chlorohydrins, which are converted to the glycerol by treatment with sodium carbonate solution, or by heating glycerol with sodium hydroxide.
>
>    ***c.  Triclosan.***  Triclosan is a chlorophenol, a class of chemicals which is suspected of causing cancer in humans.
>
>    ***d.  Tetrasodium EDTA.***  A chelating agent derived from diphosphonic acid.

**Triclosan**

26.     One of the active ingredients in the Product is a compound known as triclosan. Triclosan was first patented as an herbicide.  Later, it was found that triclosan had antimicrobial

properties useful for hygiene, but limited antiviral and antifungal efficacy.  Triclosan was used in some soaps and deodorants since the 1960s and was first used in surgical scrub for medical professionals in the early 1970s.  In more recent years, it has been added to many consumer products, including a wide variety of soaps and body washes, toothpaste, clothing, kitchenware, furniture, and toys.

27.     Triclosan is a chlorophenol, a class of chemicals which is suspected of causing cancer in humans.  While the companies that manufacture products containing triclosan claim that it is safe, the Environmental Protection Agency ("EPA") has registered it as a pesticide.  The EPA gives triclosan high scores, both as a human health risk and as an environmental risk.

28.     Reports have suggested that triclosan can combine with chlorine in tap water to form chloroform, which the EPA classifies as a probable human carcinogen.  As a result, triclosan was the target of a UK cancer alert.

29.     Triclosan also reacts with the free chlorine in tap water to produce lesser amounts of other compounds, like 2,4-dichlorophenol.  Most of these intermediates convert into dioxins upon exposure to UV radiation from the sun or other sources.  Although small amounts of dioxins are produced, there is a great deal of concern over this effect, because some dioxins are extremely toxic and are very potent endocrine disruptors.

30.     In 2004, a study published in Emerging Infectious Diseases, entitled "Antibacterial Cleaning Products and Drug Resistance," warned that "more extensive use of triclosan might provide a suitable environment for emergence of antimicrobial drug-resistant species in the community setting."

31.     A 2007 study, entitled "Proteomic Analysis of Triclosan Resistance in Salmonella Enterica Serovar Typhimurium," showed that Salmonella enterica could develop resistance to

triclosan.  Similar studies have shown that other types of bacteria, including Pseudomonas and

Mycobacterium species, can also become resistant to triclosan.

32.     In 2010, the FDA issued a press release advising consumers that it was reviewing

both the safety and effectiveness of products containing triclosan.  *See* FDA Consumer Health

Information, *triclosan:  What Consumers Should Know* (April 2010), available at

http://www.fda.gov/downloads/ForConsumers/ConsumerUpdates/UCM206222.pdf.

33.     In its April 2010 press release, the FDA also emphasized that animal studies have

shown that triclosan alters hormone regulation and may contribute to making bacteria resistant to

antibiotics.  *Id.*  ("Animal studies have shown that triclosan alters hormone regulation.  However,

data showing effects in animals don't always predict effects in humans.  Other studies in bacteria

have raised the possibility that triclosan contributes to making bacteria resistant to antibiotics.")

34.     The European Union banned triclosan from items expected to come into contact

with food and set limits on the amount of triclosan that can be in cosmetics.  Furthermore,

countries including Canada, Norway, Germany, Sweden, Finland, and Japan have restricted,

required warnings, or advised consumers against the use of products containing triclosan.  In

August 2009, the Canadian Medical Association asked the Canadian government to ban triclosan

use in household products under concerns of creating bacterial resistance and producing

dangerous side products (chloroform).

35.     Triclosan does not qualify as "natural" by any definition and, as set forth, may be

dangerous.

**The Product's Advertising**

36.     Defendant has made representations in its labeling, marketing and advertising that

are false and misleading.  Specifically, Defendant's packaging conveys the message that the

Product is all natural, when it is not.  Thus, the Product's packaging misleads consumers into believing that the Product is natural, when, in fact, it contains unnatural chemical ingredients.

37.     The Product's labeling and packaging is false and misleading because it includes the word "natural" as part of the Product name, thus representing that the Product, as a whole, is natural.  Further, every lid on every Product states, "Natural Protection, Aluminum Free, Paraban Free."  This statement, coupled with the Product's "natural" name, leads the consumer to falsely believe that the Product is all natural when, in fact, it contains unnatural and synthetic ingredients.  Plaintiffs relied on these representations in making their purchases.

38.      All of these representations made by Defendant are deceptive, false and misleading.  Moreover, as a result of these representations, Defendant was able to sell the Product at a premium over its deodorants that do not purport to be all natural (Arm & Hammer Ultramax® Solid Deodorant, Active Sport and other comparable name brand products), with the Product costing at least 13% more per ounce.  In other words, each of the Plaintiffs purchased the Product at a premium price over other deodorants that did not purport to be all natural.

39.     Plaintiffs and the Class paid a premium for the Product believing that the Product was natural.  Based on Defendant's representations, Plaintiffs viewed the label and thereafter purchased the Product at a premium price.  Had Plaintiffs and other members of the proposed Class been aware of the truth, they would not have purchased the more expensive "natural" Product.  As a result of the purchase, Plaintiffs suffered ascertainable loss, injury in fact, and lost money and/or property as a result of the conduct described of herein.

**Plaintiffs' Experiences**

40.     The commercials, printed advertisements, and the labeling of the Product and the representations therein, were made by Defendant.  Reasonably relying on the claims made in the

pervasive advertising message disseminated by Defendant through commercials, printed advertisements, as well as on the labeling of the Product, each of the Plaintiffs each viewed the label and purchased Arm & Hammer® Essentials™.  Both of the Plaintiffs reasonably expected that the Product would, in fact, be all natural, as the labeling conveyed it would be.

41.     Plaintiff Trewin's claims are based on the Product's labels.  In or about January 2012, Trewin was shopping in a Rite Aid located in Sewell, New Jersey.  While in the Rite Aid, Trewin shopped for deodorant and, specifically, was interested in purchasing an all natural deodorant.  While shopping for a deodorant, Trewin saw bottles of the Product on the store shelf. Trewin took a bottle of the Product of the shelf and read the label.  In doing so, Trewin read certain representations on the label, including representations that the Product was a "Natural Deodorant" and that the Product provided "Natural Protection."  Based on viewing these representations on the label, Trewin understood that the Product was an all natural deodorant. As a result of this understanding, and in reliance on the label's claims that the Product was all natural, he purchased the Product from the Rite Aid for approximately $3.79.  This purchase price was a premium over and above deodorants that did not purport to be all natural, which Trewin was willing to, and did, pay because he understood from the labeling that the Product was all natural.

42.     After using the Product as directed, Plaintiff Trewin determined that the Product was not all natural as claimed and, in fact, contained synthetic, unnatural ingredients.

43.     Plaintiff Trewin suffered an ascertainable loss in either the amount of the purchase price of the Product, or the premium he paid for the Product, as a result of the conduct of Defendant described herein, including the fact that the Product was not all natural as Defendant represented.

44.     Plaintiff Farhatt's claims are based on the Product's labels.  In or about January 2012, Farhatt went to a Schnucks Superstore located at Manchester and Ballas Roads, in St. Louis, Missouri, to shop for food and personal care items.  Plaintiff Farhatt buys, when possible, environmentally friendly products, which do not contain chemicals that could harm him, others or the environment.  As such, Farhatt routinely purchases items such as organic fruits and vegetables, and all natural personal care items.

45.     While looking at personal care items in the Schnucks, Plaintiff Farhatt saw the Product and viewed the representations on the label.  While viewing the label, Plaintiff Farhatt saw Defendant's representations that the Product was a "Natural Deodorant" and that the Product provided "Natural Protection."   Based on reviewing these representations on the label, he understood that the Product was all natural.   In reliance on the label's representations that the Product was all natural, he purchased the Product and paid approximately $3.79.  This purchase price was a premium over and above deodorants that did not purport to be all natural, which Farhatt was willing to, and did, pay because he understood from the labeling that the Product was all natural.

46.     After using the Product as directed, Plaintiff Farhatt determined that the Product was not all natural as claimed and, in fact, contained synthetic, unnatural ingredients.

47.     Plaintiff Farhatt suffered an ascertainable loss in either the amount of the purchase price of the Product, or the premium he paid for the Product, as a result of the conduct of Defendant described herein, including the fact that the Product was not all natural as Defendant represented.

48.     Plaintiffs would not have purchased the Product or would have paid substantially less for it had they known the truth and not been misled by the labeling.

**New Jersey's Substantive Laws Apply To The Proposed Class**

49.    New Jersey's substantive laws may be applied to the claims of Plaintiffs and the Class under the Due Process Clause, 14th Amend, § 1, and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution.  New Jersey has significant contact, or a significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

50.    Defendant's headquarters and principal place of business are located in New Jersey.  Defendant also owns property and conducts substantial business in New Jersey and, therefore, New Jersey has a significant interest in regulating Defendant's conduct under its laws. Defendant's decisions to reside in New Jersey and avail itself of New Jersey's laws renders the application of New Jersey law to the claims herein constitutionally permissible.

51.    A substantial number of Class members reside in New Jersey.

52.    New Jersey also is the state from which Defendant's misconduct emanated.  This conduct similarly injured and affected Plaintiffs and Class members.  For instance, Church & Dwight's marketing and advertising efforts (including Product labeling) were created in and orchestrated from the location of its present headquarters in New Jersey.

53.    The application of New Jersey's laws to the Class is also appropriate under New Jersey's choice of law rules because New Jersey has significant contacts to the claims of the Plaintiffs and the Class, and New Jersey has a greater interest in applying its laws here than any other interested state.

## <u>CLASS ACTION ALLEGATIONS</u>

54.     Plaintiffs bring this action on behalf of themselves and all other persons similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

55.     The Class that Plaintiffs seek to represent is defined as follows:

> **<u>Class:</u>**
>
> All persons who purchased Arm & Hammer® Essentials™ Natural Deodorant ("Class") within the United States, not for resale or assignment.

Excluded from the Class are (a) Defendant, including any entity in which Defendant has a controlling interest, and its representatives, officers, directors, employees, assigns and successors; (b) any person who has suffered personal injury or is alleged to have suffered personal injury as a result of using the Product; and (c) the Judge to whom this case is assigned. In the alternative to a nationwide Class, Plaintiffs seeks to represent two sub-classes defined as:

> **New Jersey Class**: All persons who purchased Arm & Hammer® Essentials™ Natural Deodorant within New Jersey, not for resale or assignment ("New Jersey Sub-Class").
>
> **Missouri Class**: All persons who purchased Arm & Hammer® Essentials™ Natural Deodorant within Missouri, not for resale or assignment ("Missouri Sub-Class").

56.     **<u>Numerosity/Impracticability of Joinder:</u>**  The members of the Class are so numerous that joinder of all members would be impracticable.  The proposed Class includes, at a minimum, thousands of members.  The precise number of Class members can be ascertained by reviewing documents in Defendant's possession, custody and control or otherwise obtained through reasonable means.

57.     **<u>Commonality and Predominance:</u>**  There are common questions of law and fact which predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, include, but are not limited to the following:

      a.      whether Defendant engaged in a pattern of fraudulent, deceptive and misleading conduct targeting the public through the marketing, advertising, labeling and sale of the Product;

      b.      whether Defendant's acts and omissions violated the CFA;

      c.      whether Defendant made material misrepresentations of fact or omitted to state material facts to Plaintiffs and the Class regarding the marketing, promotion, advertising, labeling and sale of the Product;

      d.      whether Defendant's false and misleading statements of fact and concealment of material facts regarding the Product were intended to deceive the public;

      e.      whether, as a result of Defendant's misconduct, Plaintiffs and the Class are entitled to equitable relief and other relief, and, if so, the nature of such relief; and

      f.      whether the members of the Class have sustained ascertainable loss and damages as a result of Defendant's acts and omissions, and the proper measure thereof.

58.    **Typicality:**  The representative Plaintiffs' claims are typical of the claims of the members of the Class they seek to represent.  Plaintiffs and all Class members have been injured by the same wrongful practices in which Defendant has engaged.  Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the Class members, and are based on the same legal theories.

59.    **Adequacy:**  Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class, and have retained Class counsel who are experienced and

qualified in prosecuting class actions.  Neither Plaintiffs nor their attorneys have any interests which are contrary to or conflicting with the Class.

60.     **Superiority:**  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by the Class are likely in the millions of dollars, the individual damages incurred by each Class member resulting from Defendant's wrongful conduct are too small to warrant the expense of individual suits.  The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.  In addition, Defendant has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

61.     Plaintiffs will not have any difficulty in managing this litigation as a class action.

## FIRST COUNT

**Asserted on Behalf of the Class or, in the Alternative, on Behalf of
the New Jersey Sub-Class**

**(Violations of N.J.S.A. § 56:8-1, *et seq*.)**

62.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully

set forth herein.

63.     Plaintiffs, other members of the Class and Defendant are "persons" within the

meaning of the CFA.

64.     Plaintiffs and other members of the Class are "consumers" within the meaning of

the CFA.

65.     The Product is "merchandise" within the meaning of the CFA.

66.     At all relevant times material hereto, Defendant conducted trade and commerce in

New Jersey and elsewhere within the meaning of the CFA.

67.     The CFA is, by its terms, a cumulative remedy, such that remedies under its

provisions can be awarded in addition to those provided under separate statutory schemes.

68.     Defendant has engaged in deceptive practices in the sale of the Product because

Defendant knew that it had purposely marketed and sold the Product in a manner that made

Plaintiffs and other reasonable consumers believe that the Product was natural.

69.     Defendant has engaged in deceptive practices in the sale of the Product because

Defendant knew that it contained synthetic ingredients and was not natural.

70.     Similarly, Defendant also failed to disclose material facts regarding the Product to

Plaintiffs and members of the Class -- namely, that the Product is not natural and contains

numerous artificial ingredients, including Triclosan, a potentially harmful additive.

71.     Defendant intended that Plaintiffs and the other members of the Class rely on these acts of concealment and omissions, so that Plaintiffs and other Class members would purchase the Product.

72.     The false and misleading representations were intended to, and likely to, deceive a reasonable consumer.

73.     The misrepresentations and omissions are material to the reasonable consumer, and are facts that a reasonable consumer would consider important in deciding whether to purchase the Product and how much to pay.

74.     Defendant's representations and omissions were, and are, material to reasonable consumers, including Plaintiffs, in connection with their respective decisions to purchase the Product.

75.     Had Defendant not engaged in false and misleading advertising regarding the Product, Plaintiffs and other members of the Class would not have purchased the Product.

76.     Had Defendant disclosed all material information regarding the Product to Plaintiffs and other members of the Class, they would not have purchased the Product.

77.     The foregoing acts, omissions and practices directly, foreseeably and proximately caused Plaintiffs and other members of the Class to suffer an ascertainable loss in the form of, *inter alia*, monies spent to purchase the Product at a premium price, and they are entitled to recover such damages, together with appropriate penalties, including, but not limited to, treble damages, attorneys' fees and costs of suit.

78.     Application of the CFA to all Class members, regardless of their state of residence, is appropriate as described herein and because, *inter alia:*

a.      Defendant controlled and directed its nationwide sales operations and support operations from New Jersey;

b.      Defendant's marketing operations and decisions, including the decisions as to how to advertise, promote and sell the Product, were made in New Jersey, and Defendant's sales and marketing personnel are all based in New Jersey;

c.      All Product review and analysis was conducted in New Jersey;

d.      Defendant's principal places of business are located in New Jersey;

e.      The significant employees of Defendant are based in New Jersey;

f.      The majority of relevant documents maintained by Defendant are located in New Jersey; and

g.      The facts and circumstances of this case bestow numerous contacts with the State of New Jersey so as to create a state interest in applying the CFA to Defendant, thereby making application of New Jersey law to the entire Class appropriate.

## SECOND COUNT

### Asserted, in the Alternative, on Behalf of
### the Missouri Sub-Class

### (Violation of the Missouri Merchandising Practices Act)

79.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if fully set forth herein.

80.     The Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020 (West 2010), provides, in part, as follows:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... in or from the state of Missouri, is declared to be an unlawful practice. ... Any act, use or employment declared

- 20 -

unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

81.     Defendant's business practices, in its advertising, marketing, packaging, and sales of the Product as natural, were implemented so as to extract an unfair and unwarranted premium from consumers is an unconscionable, unfair, and unlawful practice under the Act, and constitutes multiple, separate violations of Mo. Ann. Stat. § 407.020 (West 2010).

82.     Defendant engaged in the unlawful practices set forth in this Complaint in the sale of merchandise in trade or commerce.

83.     Plaintiff Farhatt and members of the Missouri Sub-Class purchased Defendant's Product primarily for personal, family, or household purposes.

84.     Defendant's misrepresentations or omissions as set forth in this Complaint are material in that they relate to matters which are important to consumers or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiff Farhatt and members of the Missouri Sub-Class, regarding Defendant's products.

85.     Defendant's business practices, in its advertising, marketing, packaging, and sales of the Product as a natural Product when, in reality, it contains numerous chemicals, is an unconscionable, unfair, and deceptive act or practice, in that it (1) offends established public policy, (2) is immoral, unethical, oppressive, or unscrupulous, and/or (3) is substantially injurious and has caused actual and ascertainable loss of money and damages to consumers, including Plaintiff Farhatt and members of the Missouri Sub-Class, who paid an unfair and unwarranted premium for Defendant's Product, which was not natural as advertised and marketed.

86.     At all times material hereto, it was reasonably foreseeable that Plaintiff Farhatt, and all others similarly situated, would rely on the false and fraudulent advertising, marketing,

and packaging made by Defendant.  Said reliance has caused Plaintiff Farhatt, and all others similarly situated, to be damaged.

87.     Plaintiff Farhatt, and all others similarly situated, have suffered actual and ascertainable loss of money and damages as an actual and proximate result of Defendant's intentional misrepresentation and concealment of material facts, in that they paid an unwarranted and unfair premium for Defendant's Product.

88.     Defendant's unlawful conduct set forth in this Complaint was and is wanton, willful and outrageous, and manifests a reckless disregard for the consequences of Defendant's actions and for the rights of Plaintiff Farhatt and members of the Missouri Sub-Class and warrants an award of punitive damages to deter Defendant, and others in similar circumstances, from committing such actions in the future.

89.     Defendant's conduct described herein actually and proximately caused Plaintiff Farhatt and the Missouri Sub-Class members to suffer damages as described throughout this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Defendant granting the following relief:

A.     An order certifying this case as a class action and appointing Plaintiffs as Class representatives and Plaintiffs' counsel to represent the Class;

B.     Restitution and disgorgement of all amounts obtained by Defendant as a result of its misconduct, together with interest thereon from the date of payment, to the victims of such violations;

C.      All recoverable compensatory and other damages sustained by Plaintiffs and the Class;

D.      Actual and/or statutory damages for injuries suffered by Plaintiffs and the Class and in the maximum amount permitted by applicable law;

E.      An order (1) requiring Defendant to immediately cease its wrongful conduct as set forth above; (2) enjoining Defendant from continuing to misrepresent and conceal material information and conduct business via the unlawful, unfair and deceptive business acts and practices complained of herein; (3) ordering Defendant to engage in a corrective notice campaign; and (4) requiring Defendant to pay to Plaintiffs and all members of the Class the amounts paid for the Product;

F.      Statutory pre-judgment and post-judgment interest on any amounts;

G.      Payment of reasonable attorneys' fees and costs; and

H.      Such other relief as the Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated: January 7, 2013                    SHEPHERD, FINKELMAN, MILLER &
                                          SHAH, LLP


                                          /s/ James C. Shah
                                          James C. Shah
                                          Natalie Finkelman Bennett
                                          475 White Horse Pike
                                          Collingswood, NJ 08107
                                          Telephone:  (856) 858-1770
                                          Facsimile:  (856) 858-7012
                                          Email: jshah@sfmslaw.com
                                                 nfinkelman@sfmslaw.com

Jayne A. Goldstein
SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP
1640 Town Center Circle
Suite 216
Weston, FL 33326
Telephone: (954) 515-0123
Facsimile: (954) 515-0124
Email: jgoldstein@sfmslaw.com

Eric D. Holland
HOLLAND GROVES SCHNELLER
  & STOLZE, LLC
300 North Tucker Boulevard, Suite 801
St. Louis, MO  63101
Telephone: (314) 241-8111
Facsimile: (314) 241-5554
Email:  eholland@allfela.com

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court
P.O. Box 1190
Alexandria, LA  71309
Telephone: (216) 621-8484
Facsimile: (216) 771-1632
Email: rarsenault@nbalawfirm.com


Charles E. Schaffer
LEVIN, FISHBEIN, SEDRAN &
  BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA  19106
Telephone: (215) 592-1500
Facsimile: (215) 592-4663
Email:  eschafffer@lfsblaw.com

Adam J. Levitt
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC
55 West Monroe Street, Suite 1111
Chicago, IL  60603
Telephone: (312) 984-0000
Facsimile: (312) 984-0001
Email:  levitt@whafh.com

John R. Climaco
CLIMACO, WILCOX, PECA,
  TARANTINO & GAROFOLI CO., L.P.A.
55 Public Square, Suite 1950
Cleveland, OH   44113
Telephone: (216) 621-8484
Facsimile: (216) 771-1632
Email:  jrclim@climacolaw.com

Attorneys for Plaintiffs and the Proposed
Class